**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RUSSELL LANDE,** | : | |
| **Plaintiff**, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF BETHLEHEM, et al.,** | : | **No. 07-2902** |
| **Defendants.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                                           **December 10, 2010**

Patrolman Russell Lande alleges that his department and his union turned on him after Lande

told a prosecutor that two policemen had manhandled a disabled suspect.  Lande's ten-count

Amended Complaint brings federal and state law causes of action against the City of Bethlehem,

Lieutenant David Strawn, Commissioner Randall Miller, and the Fraternal Order of Police Star

Lodge No. 20 arising from Defendants' treatment of him after this incident.  Originally assigned to

the late Judge Thomas Golden, this matter was transferred to this Court on August 10, 2010.

Presently before the Court are Defendants' motions for summary judgment.  For the reasons that

follow, these motions will be granted with respect to Lande's federal claims.  The Court will also

decline to exercise supplemental jurisdiction over Lande's state law claims.


**I.      BACKGROUND**

**A.      Lande's Police Career**

Lande joined the Bethlehem Police Department ("the Department") on February 14, 1995.

(City Defs.' Mot. for Summ. J. Ex. C, Dep. of Russell Lande [Lande Dep.] 10-12.)  He has spent his

entire career with the Department as a patrolman.  (*Id.* at 474.)  Lande has occasionally assumed

temporary "acting rank," once performing a shift as acting desk sergeant. (*Id.* at 179.) His other accomplishments since joining the Department include receiving seven citations, obtaining bachelor's and master's degrees, and spearheading a campaign to build a police memorial. (*Id.* at 498.)

Lande also had a disciplinary history prior to the events underlying this lawsuit: the Department reprimanded him in 2002 and 2003, placed a number of warning notes in his "tickler file" in 2004, and suspended him for ten days in 2005. The 2002 incident involved Lande's use of a "Mobile Data Terminal" ("MDT"), a police laptop with which officers communicate via text messages. (Statement of Undisputed Material Facts in Support of City Defs.' Mot. for Summ. J. [City Facts] ¶ 90; *see also* City Defs.' Mot. for Summ. J. Ex. I(a), MDT Transmission Tr. [MDT Tr.].) Using this MDT account, Lande earned a reprimand for commenting in an MDT transmission that dealing with then-Sergeant Thomas Craig, was "like talking to a watermelon." (Lande Dep. 414-16.)

The Department reprimanded Lande again in 2003 for making disparaging remarks about the local ambulance service. (*Id.* at 421.) Between March and December 2004, the Department documented incidents in Lande's disciplinary file including failure to store evidence properly, hitting a pole with his police cruiser, downgrading offenses in an incident report, and complaining to supervisors that he was not given opportunities to assume acting rank. (*Id.* at 19, 426; City Defs.' Mot. for Summ. J. Ex. V, Prior Disciplinary Record of Pl. Lande for Traffic Ticket Incidents [Lande Disciplinary Record] 6-7.)

Lande received his most serious punishment in January 2005, when he was suspended for withdrawing a parking ticket. (Lande Dep. 427-28.) Lieutenant Strawn submitted a report in

connection with this incident in which he accused Lande of lying about why he had withdrawn the ticket. (*Id*. at 428-29; Lande Disciplinary Record.) Strawn recommended a thirty-day unpaid suspension and noted that Lande "could technically be charged criminally" and "could have lost his job" for withdrawing the citation. (Lande Disciplinary Record 8-10.) Then-Deputy Commissioner Randall Miller subsequently met with Lande in February 2005 and told Lande that he intended to punish him with a month-long suspension. (Lande Dep. 190-91.) Lande submitted a grievance to his union, the Fraternal Order of Police Star Lodge No. 20 ("the FOP"). He ultimately agreed to serve a ten-day suspension after discussions with police and FOP officials. (*Id*. at 192, 427-29; Pl.'s Statement of Facts in Opp'n to City Defs.' Mot. for Summ. J. [Lande City Facts] ¶ 44.)

### B.     The Lopez Arrest

As of April 5, 2005, Lande belonged to the Department's Platoon One and reported to Lieutenant David Strawn. (Lande Dep. 19.) On that day, however, Lande was working overtime with a different platoon supervised by Sergeant Robert Ripper. (*Id*. at 21-22.) Lande responded to a call at a home in the Bethlehem Marvine Housing Development, a public housing complex. (*Id*. at 23-25, 28.) He first checked the front of the residence. (*Id*. at 29.) Finding "nothing going on" there, he went to the rear, where he saw Sergeant Ripper interviewing people. (*Id*. at 29-30.) Lande also saw a man lying on the ground near a wheelchair. (*Id*. at 61-62.) He later learned that this man was Reynaldo Lopez. (*Id*. at 16-17.) Lopez was handcuffed and appeared calm when Lande arrived on the scene. (*Id*. at 93.) Lande did not know why Lopez was on the ground or why he had been arrested. (*Id*. at 18, 61.)

Officer Patrick Maczko had pulled Lopez over for driving without a valid license. (City Defs.' Mot. for Summ. J. Ex. P, Dep. of Patrick Maczko [Maczko Dep.] 29.) Police had stopped and

cited Lopez for driving without a valid license numerous times before. (*Id*. at 24-29.) *See Lopez v. Maczko*, Civ. A. No. 07-1382, 2008 WL 4083016, at *1 (E.D. Pa. Aug. 28, 2008). In his description of the incident, Maczko claimed Lopez was uncooperative. (Maczko Dep. 30-31.) Lopez's brother then appeared and tried to wheel Lopez away. (*Id*. at 33.) Maczko grabbed Lopez's wheelchair and told Lopez that he was "not free to go," at which point Lopez struck Maczko in the chest. (*Id*.)

A scuffle ensued during which Lopez held on to his car and refused to let go. (*Id*. at 33-34.) Maczko was joined by Officer James Freed, who struck Lopez in the wrist with his flashlight. (*Id*. at 38.) Freed and Maczko then handcuffed Lopez. (*Id*.) Maczko first noticed that Lande had arrived as he picked Lopez up off the ground and carried him to the patrol car. (*Id*. at 40.) Maczko responded to a suggestion that he "grab the wheelchair" by saying that Lopez could "fucking walk to the car." (*Id*.) Maczko claims that he and Lande carried Lopez to his patrol car. (*Id*.)

Lande asserts that Maczko lied in his report, claiming that it was Freed who helped Maczko drag Lopez across the pavement: "one grabbed him by the arm and the other one grabbed him by the neck." (Lande City Facts ¶ 9; Lande Dep. 63, 67, 88-89) Lopez's legs were dangling as Freed and Maczko dragged Lopez for fifty feet and then "tossed" him into the patrol car. (Lande Dep. 65-66.) Lande did not stop Freed and Maczko from dragging Lopez, but repeatedly told the other officers to "tone it down." (*Id*. at 68.) One of Lopez's legs, which appeared "really thin" to Lande, was dangling outside the car as Maczko was about to close the car door. (*Id*. at 56, 71-72.) Lande was concerned that Maczko might "chop the leg off" with the door and grabbed Maczko's arm. (*Id*.) Lopez eventually worked his way fully into the patrol car and was taken to the police station. (*See id*. at 72.)

Lande first spoke with Lopez at the police station after the arrest. (*Id*. at 31-32.) Lopez

complained that he had not been permitted to use the bathroom and showed Lande his catheter. (*Id.* at 34.) Lande helped Lopez use the bathroom and accompanied him to the hospital, as Lopez had requested medical attention. (*Id.* at 36-37.)

Later that day, Lande confronted Maczko about his use of force during Lopez's arrest. (Maczko Dep. 50.) Maczko responded that Lopez had struck him and that he felt he "didn't do anything to him." (*Id.* at 51.) Maczko later discussed this conversation with Sergeant Ripper. (*Id.* at 54.) Maczko did not complete a use of force report for the Lopez arrest, though Freed did. (*See* Pl.'s Counterstatement of Facts in Opp'n to Union's Mot. for Summ. J. [Lande Union Facts] ¶¶ 13-14.)

Sergeant Ripper witnessed Lopez's arrest firsthand. (Lande Dep. 70.) Lande approached Ripper shortly after the arrest and asked whether Ripper thought Maczko "was out of control or if it was handled right." (Ripper Dep. 32-33.) Ripper responded that he would probably have moved the patrol car closer to Lopez rather than carried Lopez to the car if he "could do it all over again, Monday morning quarterback." (*Id.* at 33.) However, Lande did not formally report the incident to the lieutenant in charge of Ripper's squad or to anyone else in the Department at that time. (Lande Dep. 75, 127.) Lande did not file a report because both Ripper and the shift lieutenant had seen Lopez in his wheelchair and knew that he had been taken to the hospital in an ambulance from the police station. (*Id.* at 140.) Furthermore, Lande believed that Ripper, who had witnessed the arrest, was "taking care of it." (*Id.* at 82, 98.) Lande also mentioned the incident to roughly a dozen non-supervisory police officers. (*Id.* at 274-75.)

## C. The Lopez Trial

As a result of his encounter with Maczko and Freed, Lopez was charged with aggravated

assault, simple assault, terroristic threats, harassment, resisting arrest, disorderly conduct, and driving with a suspended license. (City Defs.' Mot. for Summ. J. Ex. G, Common Pleas Tr. [Lopez Hr'g Tr.] 16.) Lande was subpoenaed to appear at a preliminary hearing prior to Lopez's trial, apparently because Maczko had identified Lande as a witness to the Lopez arrest in his report. (Lande Dep. 87-88.) However, at Maczko's request, Lande left the hearing and did not testify. (*Id*. at 84-87.)

The district attorney's office subpoenaed Lande to appear at Lopez's trial. (Lopez Hr'g Tr. 2.) The Department requires officers to respond to such subpoenas and to cooperate with the district attorney's office. (City Defs.' Mot. for Summ. J. Ex. X, Deposition of Commissioner Randall Miller [Miller Dep.] 156.) Lande appeared pursuant to the subpoena. However, Lande spoke privately with John Obrecht, the assistant district attorney assigned to the Lopez case, prior to the start of jury selection. (City Defs.' Mot. for Summ. J. Ex. F, Dep. of John Obrecht [Obrecht Dep.] 78.) As a result of this conversation, Obrecht spoke with his superior, District Attorney John Morganelli, and with the Department's court liaison officer Jerry Kametz.[1] (Obrecht Dep. at 71.) Obrecht promptly disclosed to the trial judge and Lopez's defense counsel that Lande had told him he disagreed with Maczko's handling of the arrest. (Lopez Hr'g Tr. 5.) As a result, the district attorney's office dropped all but the disorderly conduct charge, to which Lopez pled guilty. (*Id*. at 6.)

### D.     The MDT Incident and Lande's Suspension

A month after the Lopez trial, Lande accused Freed of using excessive force on a "cripple" during an MDT exchange (MDT Tr.) Back in the Department garage after their shifts, Freed approached Lande "[b]ecause he wanted to fight," forcing Lande to retreat into the station house.

---

[1] Lande also claims he reported his concerns regarding Lopez's arrest directly to Kametz the day of the trial. (Lande Dep. at 74-75.)

(Lande Dep. 436-37.)  Strawn witnessed Freed pursue Lande into the hallway of the police station.  (City Defs.' Mot. for Summ. J. Ex. D, Deposition of David A. Strawn [Strawn Dep.] 191-93.)  Strawn directed another officer, Sergeant Jeremy Alleshouse, to remove Freed from the building; Alleshouse separated Freed and Lande, ending the encounter.  (Strawn Dep. 194; Opp'n to City Defs.' Mot. for Summ. J. Ex. C, Deposition of Jeremy Alleshouse 109-10.)

Strawn investigated the MDT incident.  (Strawn Dep. 201-02.)  Freed was ultimately suspended for one day, a punishment that Lande asserts fell well below the appropriate punishment suggested by the Department's "disciplinary matrix."  (Lande City Facts ¶¶ 94, 98.)  It was recommended by Strawn, Miller, or both, that Lande receive a three-day suspension for his role in the MDT incident.  (*Id*. at ¶ 98.)  Strawn communicated the discipline to Lande and told him that the information that he wrote over the MDT embarrassed the police department.  (City Facts ¶ 99; Lande City Facts ¶ 99.)

The Department's Deputy Commissioner Stuart Bedics instructed Strawn to review the courthouse incident.  (*Id*. at ¶¶ 100, 201.)  Strawn read the police reports regarding the Lopez arrest and spoke with Obrecht, Freed, and Maczko.  (*Id*. at ¶¶ 101-04.)  The City and the FOP concluded that Lande's report to Obrecht was meritless because a Department review revealed that no excessive force was used during the Lopez arrest.  (*Id*. at ¶¶ 107-10.)

Strawn concluded his investigation by October 2006, finding that Lande should be charged with violating the Department's Standard Operating Procedure ("SOP") 56(C), "neglect of duty," and SOP 56(H), "interference with the administration of justice." (*Id*.  ¶¶ 105, 201; *see also* City Defs.' Mot. for Summ. J. Ex. J., Lande Violation Record.)  Lande was called before Bedics and Captain John Sarnicky to discuss the MDT incident and Lande's conversation with Obrecht in

November 2006. (Lande Dep. 336-37.) The FOP's president, Steven Marshall, was present to represent Lande. (*See id*.) Lande recalled that Bedics and Sarnicky aggressively "interrogat[ed]" him regarding the MDT incident. (*Id*.) However, Lande acknowledged that he was given a chance to explain himself. (*Id*. at 338.) Nobody threatened him at this meeting, though Lande recalled that it was "intimidating." (*Id*.) Lande "couldn't read anything from" the senior Department officials, and was "more concerned just being a junior officer in that office." (*Id*. at 339-40.)

As a result of the Lieutenant Strawn's "harassment" arising from these two incidents, Lande transferred to the night shift on January 1, 2007, where he became a member of a different platoon supervised by Lieutenant Craig. (*Id*. at 13-15.) Still, Lande noted that his requests for personal days, court days, and overtime were consistently denied and that he was frequently taken to task by his superiors for minor infractions. (*See* City Facts ¶ 43; Lande City Facts ¶ 43; *see also* Lande Dep. 376-78.)

In October of 2007, after Lande filed this lawsuit, the City issued an Amended Violation Record that cited to the Police Manual's "failure to report" section rather than the SOP's "neglect of duty" section with respect to Lande's alleged failure to report his observations of unreasonable force. (City Facts ¶ 293.) Ultimately, upon consideration of Lande's past disciplinary history, it was determined that Lande should be suspended for a total of six days to be served in two three-day blocks in different pay periods. (City Facts ¶¶ 210, 212, 274; Lande City Facts ¶¶ 210, 212, 274.)

### E. Grievance Proceedings

Department police employees below the rank of lieutenant are represented by the FOP. (Lande Union Facts ¶ 2.) These employees, including Lande, are covered by a Collective Bargaining Agreement ("CBA") between the City and the FOP. (Union's Facts ¶ 2; Lande Union Facts ¶ 2.)

The CBA provides that the "City retains the exclusive right to manage its business . . . to suspend, discharge, demote or take any other disciplinary action" subject to the terms of the CBA. (Union's Mot. for Summ. J. Ex. B. [CBA] art. VIII.)

Member-submitted grievances are subject to review by an FOP committee, which votes on whether to act on the grievance request. (Lande Union Facts 29; *see also* CBA art. XXIX.) Pursuant to the CBA, the grievances submitted to the Department by the FOP are heard by the Department Commissioner's Office; if the grievances cannot be remedied at that level, they are sent to the City's Business Administrator. (City Facts ¶¶ 194, 195; Lande City Facts ¶¶ 194, 195.) The CBA provides that failure to process a grievance within the time limits established by the CBA "presumes that it . . . has been satisfactorily resolved at the last step to which it has been properly processed." (CBA art. XXIX.)

Lande submitted grievances for the discipline he received for the MDT incident and report to Obrecht on Nov. 5, 2006 and Feb. 7, 2007, respectively. (Lande Union Facts ¶¶ 34, 50; City Defs.' Mot. for Summ. J. Ex. L., November 5, 2006 Grievance Letter From Russell Lande to FOP; Opp'n to Union's Mot. for Summ. J. Ex. R, February 7, 2007 Grievance Letter From Russell Lande to FOP.) Lande admitted to poor judgment in his use of the MDT, but complained that a three-day suspension was "arbitrary, superficial, capricious and insulting" given his "positive past performance" with the Department. (Nov. 5, 2006 Grievance Letter.)

Lande met with FOP official Wade Haubert a number of times to discuss his discipline. (*See* Lande Dep. 453; Opp'n to Union's Mot. for Summ. J. Ex. V., Apr. 25, 2007 Letter From Russell Lande to Wade Haubert [Apr. Lande Letter].) Unsatisfied with the FOP's response, Lande wrote to Haubert on April 25, 2007, again protesting his suspension. (Apr. Lande Letter.) Lande

acknowledged in this letter and at his deposition that he was aware the FOP had presented his grievance to the Commissioner's Office by that time. (*Id*.; Lande Dep. 460-61.) He complained, however, that he had been led to believe that the matter was closed based on his discussions with Haubert. (April Lande Letter.) Despite Haubert's representation that the Department would not pursue discipline against Lande due to his whistleblower status, Lande received a notice of suspension on April 24, 2007. (*Id*; *see also* Opp'n to Union's Mot. for Summ. J. Ex. I., V.S. of Russell Lande in Resp. to Union's Mot. For Summ. J. [Lande Union Statement] ¶ 37.)

Lande appealed to the FOP's Executive Board. (Opp'n to Union's Mot. for Summ. J. Ex. W., May 9, 2007 Letter From Lande to FOP Executive Board.) In this letter, Lande grieved his suspension and argued that he was not allowed "to complete the formal grievance process." (*Id*.) He also charged that he was not permitted to appeal to the City's Business Administrator or to request arbitration. (*Id*.) Lande suspects the FOP never brought his grievance to the Business Administrator, observing that no one in that office recalled receiving Lande's grievance from the FOP. (Lande Union Facts 60.) Around this time, Haubert took over from Marshall as FOP president. (*See id*. at 38.) Marshall had traditionally maintained a policy of pursuing every grievance filed; Haubert "seemed to have the same approach" to grievances as Marshall. (*Id*. at 34.)

Lande continued writing letters to the FOP to determine whether his grievances were going forward. However, he claims the FOP did not keep him informed of their status and did not tell him he could appeal local FOP decisions to the union's state headquarters. (Lande Union Statement ¶¶ 24-36, 43; Opp'n to Union's Mot. for Summ. J. Ex. B., FOP Bylaws art. XVI.) In correspondence with Lande after Lande sued the FOP, the FOP informed Lande that it had decided not to pursue a grievance with respect to his suspension, since it was "a result of an agreement made between you

and your attorney with the City which had no involvement of the FOP." (Opp'n to Union's Mot. for Summ. J. Ex. EE (e-mail from Wade Haubert to Russell Lande dated Feb. 5, 2008.)

Lande served the three-day suspensions in May and December of 2007. (Lande Union Facts ¶¶ 59-60.)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the moving party does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

# III. DISCUSSION

## A. Federal Labor Claims Against All Defendants

Lande sued the City of Bethlehem, Commissioner Randall Miller, Lieutenant David Strawn (collectively, "the City Defendants") and the FOP under the Labor Management Relations Act ("LMRA") for breaching the CBA. Municipalities do not fall within the LMRA's definition of "employer." *Manfredi v. Hazleton City Auth., Water Dept.*, 793 F.2d 101, 104 (3d Cir. 1986). Municipal workers are thus not "employees" and cannot invoke this Court's jurisdiction under 28 U.S.C. § 185(a). *Castellani v. Bucks County*, Civ. A. No. 07-1198, 2008 WL 618653, at *2-3 (E.D. Pa. Feb. 29, 2008) (citing *Manfredi*, 793 F.2d at 104)). The Court therefore lacks jurisdiction over Lande's claims against the City Defendants under the LMRA.

Lande's LMRA claims against the FOP must also be dismissed. Lande confirmed at oral argument that he relies solely on the LMRA and supplemental jurisdiction in his effort to maintain his claims against the FOP in this forum. Under the LMRA, claims against a municipal employee's union cannot survive dismissal of the claims against the defendant municipality. *Manfredi*, 793 F.2d at 104 n.5. The Court will thus dismiss Lande's LMRA claim against the FOP.

## B. Section 1981 Claim Against All Defendants

Lande's claim under 42 U.S.C. § 1981 alleges discrimination and retaliation by the City Defendants due to Lande's "association with Mr. Lopez (who upon information and belief is Hispanic)." (Am. Compl. ¶ 95.) Section 1981 provides redress for discrimination based on race, alienage, ancestry or ethnic characteristics. *See Deserne v. Madalyn and Leonard Abramson Ctr. for Jewish Life, Inc.*, Civ. A. No. 10-3694, 2010 WL 4665915, at *3 (E.D. Pa. Nov. 17, 2010) (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987)). A prima facie case of racial

discrimination under § 1981 generally requires a showing that a plaintiff is a member of a racial minority and that a defendant intended to discriminate against him on the basis of his race. *See Brown v. Philip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir. 2001).

However, a plaintiff who is not a member of a racial minority may recover under § 1981 if the discrimination he suffered was caused by his association with or advocacy on behalf of racial minorities. *See, e.g., Benjamin v. Aroostook Med. Ctr.*, 57 F.3d 101, 105 (1st Cir. 1995); *Macedonia Church v. Lancaster Hotel Ltd. P'ship*, Civ. A. No. 05-153, 2010 WL 3925199, at *9 (D. Conn. Sept. 30, 2010) (citing *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 312 (2d Cir. 1975)). To sustain such a claim, however, the non-minority plaintiff must show that those for whom he has advocated would have had a valid cause of action for direct discrimination themselves. *Estate of Oliva v. New Jersey*, 579 F. Supp. 2d 643, 665 (D.N.J. 2008) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008)).

Lande's § 1981 claim fails because he offers no evidence that Lopez could have recovered under the statute himself. Lopez never brought a § 1981 claim in his lawsuit against Maczko and the City. (Lopez Compl. 2, *Lopez v. Maczko*, Civ. A. No. 07-1382 (E.D. Pa. Apr. 5, 2007).) Indeed, Lande's counsel conceded at oral argument that there is no direct evidence of an intent to discriminate against Lopez due to his race with respect to Maczko's decision to pull Lopez over; the record indicates that Maczko stopped Lopez's vehicle because he knew Lopez was driving without a license, not because of his race. (*See* Maczko Dep. 29.)

Lande testified that there is generally an anti-minority bias in the Department which manifests itself in the Department's hiring practices, racist banter, and inappropriate "things that are hung up through the department . . . that make fun of minorities." (*See* Lande Dep. 328-29, 334.)

This generalized assertion of an intolerant work environment does not constitute evidence of an intent to discriminate against Lopez on the basis of his race. The Court will therefore dismiss Lande's claims under § 1981.

**C.    Section 1983 Claim Against City Defendants**

Lande brings three sets of federal claims against the City Defendants via 42 U.S.C. § 1983, alleging violations of Lande's rights under the:  (1) First Amendment; (2) Americans with Disabilities Act ("ADA"); and (3) Fourteenth Amendment.  (Compl. ¶¶ 97-111.)  Lande's § 1983 claims attribute these harms to Lieutenant Strawn and Commissioner Miller in their individual and official capacities as well as to the City.

Section 1983 provides that a plaintiff may bring a lawsuit against state actor for a violation of a right, privilege or immunity secured by the Constitution or laws of the United States.  *See Berg v. County of Allegheny*, 219 F.3d 261, 268 (3d Cir. 2000).  As a threshold matter, the Court must dismiss Lande's official capacity claims against Strawn and Miller.  Official capacity claims are duplicative of claims against the entity of which the defendant officer is an agent.  *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  Lande's official capacity claims are thus identical to his claims against the City itself.

*1.    First Amendment claims*

Lande alleges the City Defendants violated his First Amendment rights by disciplining him "for engaging in speech that was not pursuant to his official duties and that regarded matters of public concern."  (Am. Compl. ¶ 99.)  Two incidents form the basis of Lande's First Amendment claims:  his meeting with Obrecht at the Lopez trial and his statements on the MDT in September of 2006.  (*Id*. ¶¶ 26-27, 34, 44, 59.)

Constitutional retaliation claims require a showing that: (1) the plaintiff engaged in constitutionally protected activity; (2) the government retaliated; and (3) the protected activity caused the retaliation. *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997). An employee-plaintiff's speech must be "on a matter of public concern" to satisfy the "constitutionally protected" prong of this test. *Watters v. City of Phila.*, 55 F.3d 886, 892 (3d Cir. 1995). The Court must also determine whether the employee was speaking as part of his official duties, as "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006).

### a. *Lande's conversation with Obrecht*

Lande cannot sustain a First Amendment claim based on his conversation with Obrecht because his speech on that occasion was pursuant to his official duties as a police officer. The parties do not dispute that officers subpoenaed by the district attorney's office have a duty to appear at trial and cooperate with the assistant district attorney responsible for the case. (*See* Lande Dep. 130-31; Miller Dep. 156; *see also* CBA art. XI (providing that a "day in court shall be considered a day worked" for police officers subpoenaed to appear as prosecution witnesses "so long as the court appearance is a result of the performance of the officer's regular assigned duty").) This professional obligation to report job-related information weighs against a finding that Lande spoke to Obrecht as a private citizen. *See Foraker v. Chaffinich*, 501 F.3d 231, 240-41 (3d Cir. 2007).

Lande did not testify at Lopez's trial. Rather, Lande explained at his deposition that he spoke with Obrecht to avoid testifying, as he felt the Department would want him to perjure himself. (Lande Dep. 307 ("And I didn't get up on the stand and I didn't get up there and lie like I was expected. Instead, I told the A.D.A.").) Faced with the likelihood that he would be required to

testify about the Lopez arrest under oath, Lande chose instead to tell Obrecht that he was not comfortable testifying, and to explain why. Lande's decision to avoid giving truthful testimony places his speech outside the purview of the First Amendment. His conversation with Obrecht is thus properly considered a report pursuant to his police duty to disclose relevant information to the district attorney's office. Lande thus cannot sustain a First Amendment retaliation claim on the basis of his conversation with Obrecht.

The Third Circuit recognizes an exception to *Garcetti* grounded in the importance of encouraging uninhibited testimony in court. *Reilly v. City of Atl. City*, 532 F.3d 216, 230-32 (3d Cir. 2008). This exception provides First Amendment protection for the truthful testimony of government employees on the basis that such employees are fulfilling a duty common to all citizens when, "bound by the dictates of the court and the rules of evidence," they are called to testify in court. *Id*. at 231. Lande's disclosure to Obrecht does not fall within this exception because Lande never testified.

### b. The MDT incident

Lande's exchange with Freed on the MDT also does not entitle Lande to invoke the protections of the First Amendment. Lande's statements on the MDT regarding Lopez were as follows:

> Nice try. He was a cripple and you used excessive force. You missed the trial. Remember you came late – they dropped the charges to m3 d/c. . . . You beat up a parapalegic. . . . The wheel chair should have been a clue. It was for the DA's office when they dumped the charges.

(MDT Tr. (punctuation added).)

Viewing the record in the light most favorable to Lande, the Court concludes that Lande's

MDT comments do not constitute protected citizen-speech. *See Watters*, 55 F.3d at 892 (3d Cir. 1995). Speech implicates public concern if it relates to "any matter of political, social or other concern to the community." *Morrison v. City of Reading*, Civ. A. No. 02-7788, 2007 WL 764034, at *7 (E.D. Pa. Mar. 9, 2007) (citing *Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003)). Speech which "attempts to bring to light actual or potential wrongdoing" on the part of government officials falls within this category. *Brennan*, 350 F.3d at 412 (citing *Connick v. Myers*, 461 U.S. 138, 148 (1983)). Courts must consider the "content, form, and context of a given statement" to determine if it warrants First Amendment protection. *Connick*, 461 U.S. at 147-48.

Lande did not intend to report his concerns regarding the Lopez arrest when he sent these messages. (Lande Dep. 213-14.) The MDT incident took place a month after the Lopez trial, at which Lande had already reported his concerns regarding Lopez's arrest. Lande thus believed the matter "had already been out there" in the Department at that time. (*Id.* at 228.)

A plaintiff's motives do not necessarily "negate the import of the content of the statements." *Day v. Borough of Carlisle*, Civ. A. No. 04-1040, 2006 WL 1892711, at *5 (M.D. Pa. July 10, 2006) (citing *Rankin v. McPherson*, 483 U.S. 378, 387 n.11 (1987)). However, the content, form and context of Lande's MDT speech concerning Lopez clearly demonstrate that the comments — made on an internal police communication system — could not reasonably serve to bring to light police wrongdoing. *See Karchnak v. Swarara Twp.*, Civ. A. No. 07-1405, 2009 WL 2139280, at *9 (M.D. Pa. July 10, 2009) (holding plaintiff's speech did not warrant First Amendment protection as it was not made "in an attempt to bring to light action or potential wrongdoing" on the part of defendant police department). Lande's MDT comments thus do not entitle him to invoke the First Amendment in this case.

Even if Lande's comments could be considered to implicate a matter of public concern, he cannot show that his interest in making these statements outweighed the City Defendants' interest in promoting an efficient workplace. *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). Lande had already informed a number of people, including the district attorney's office and numerous other officers, of his concerns regarding Lopez's arrest. (*See* Lande Dep. at 274-75.) Lande's interest in the MDT speech is thus undermined by the fact that the wrongdoing at issue had already been reported prior to the MDT incident. Lande's interest in making his MDT comments must yield to the Department's compelling interest in maintaining order and discipline in its ranks. *See Dodd v. SEPTA*, Civ. A. No. 06-4213, 2008 WL 2902618, at *18 (E.D. Pa. July 24, 2008) (applying *Pickering*, noting law enforcement agencies' strong interest in maintaining discipline).

### 2. Associational discrimination under the Americans with Disabilities Act

Lande alleges the City Defendants violated the Americans with Disabilities Act ("ADA") by discriminating against him because of his association with Lopez. (Am. Compl. ¶¶ 100-01.) Title I of the ADA prohibits adverse employment actions against non-disabled workers which result from the "known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). *See also Cornell Cos., Inc. v. Borough of New Morgan*, 512 F. Supp. 2d 238, 263 n.16 (E.D. Pa. 2007) (citing *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 408 (3d Cir. 2005)).

The Code of Federal Regulations provides two examples of non-disabled persons who would be covered by the statute: (1) an applicant for employment who discloses that his spouse has a disability and is then denied employment because of a belief that he would miss work to care for the

disabled spouse; and (2) an employee who does volunteer work with people who have AIDS and is discharged because the employer fears that the employee may contract the disease. 29 C.F.R. § 1630.8*; see O'Connell v. Isocor Corp.*, 56 F. Supp. 2d 649, 652 (E.D. Va. 1999). Thus, while the plaintiff need not be related to a disabled person to bring an associational ADA claim, the relationship must be fairly close. *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002) (observing that "generalized references" to association with or advocacy for disabled persons are not sufficient to sustain associational discrimination claims under the ADA).

Lande's relationship with Lopez is limited to Lande's witnessing his arrest, speaking with him in the police station afterwards, helping him use the bathroom, accompanying him to the hospital, and attending his trial. (*See* Lande Dep. 18, 31, 36-37, 44-57, 80, 478; *see also* Lande Union Facts ¶ 65 (noting that Lande "did not associate with Lopez socially.").) Lande confirmed at his deposition that he had no relationship with Lopez apart from his arrest. (*Id*. at 477.) Lande's association with Lopez is thus minimal. His discussion of Lopez's arrest over the MDT and with Obrecht may be considered advocacy of Lopez's cause. (*See, e.g.*, *id*. at 307.) However, such advocacy does not entitle Lande to bring a claim for an adverse employment action under the ADA. *See Valenti v. Massapequa Union Free Sch. Dist.*, Civ. A. No. 04-5271, 2006 WL 2570871, at *14 (E.D.N.Y. Sept. 5, 2006) (dismissing Title I associational discrimination claim based on teacher's advocacy for his disabled students). As the evidence does not demonstrate a sufficiently close relationship between Lande and Lopez to sustain an associational discrimination claim, the Court will dismiss Lande's claims under the ADA.

### 3. Fourteenth Amendment claims

Lande alleges that his six-day suspension violated his Fourteenth Amendment right to due

process by unconstitutionally depriving him of liberty and property interests. He also alleges that the City Defendants subjected him to disparate treatment because of his association with Lopez. (Am. Compl. ¶ 101.) Lande has failed to show that any of these claims should proceed to a jury.

### a.    *Procedural Due Process*

To sustain a procedural due process claim, a plaintiff must establish that (1) he has an interest derived from the Fourteenth Amendment's "life, liberty or property" clause and (2) the procedures available to him did not provide due process of law. *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006). If a plaintiff identifies a valid property interest, the court must determine what process was due under the circumstances. *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008).

### i.    *Lande's property interest in active employment*

A public employee covered by a collective bargaining agreement, such as Lande, has a property interest in his job. *Id*. at 231-32. Lande is covered by the CBA between the City and the FOP and can only be suspended pursuant to this agreement. (*See* CBA art. VIII.) He thus has a valid property interest in his job under the Fourteenth Amendment. *See Kranch v. Tamaqua Area Sch. Dist.*, Civ. A. No. 08-83, 2009 WL 4795563, at *10 (M.D. Pa. Dec. 7, 2009) (holding that employee enjoyed property interest in "not being fired without just cause or being subject to an unpaid suspension" due to collective bargaining agreement). The Court therefore must next determine whether Lande received adequate process with respect to his suspension.

Due process requires an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). *Mathews* set forth a three-part test to balance the competing interests at stake, considering: (1) the private interest in retaining

employment; (2) the government's interest in quickly removing unsatisfactory employees; and (3) the risk of an erroneous decision. *Id.* at 335; *see also Gilbert v. Homar*, 520 U.S. 924, 931-32 (1997).

State employees do not have a constitutional right to a hearing prior to an unpaid suspension, as opposed to termination. *Compare Bilski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 223 n.9 (3d Cir. 2009) (citing *Gilbert*, 520 U.S. at 926-28) (noting that failure to provide presuspension hearings does not deprive employees of due process) *with Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) (holding that public employees dismissable only for cause are entitled to a pre-termination hearing). To determine whether Lande's procedural due process rights were violated, the Court must apply the *Mathews* factors, balancing the competing interests of employee and employer. *See id*. at 223. Furthermore, in cases where a due process claim is raised against a public employer subject to mandated grievance and arbitration procedures, those procedures will satisfy due process requirements even if the hearing conducted by the employer was inherently biased. *Dykes v. Se. Pa. Transp. Auth.*, 68 F.3d 1564, 1571 (3d Cir. 1995).

Lande's procedural due process claim fails because he received a hearing and used the FOP's grievance procedure. Lande also received written notice of the discipline pending against him. (Lande Dep. 341 (describing amended written notice of discipline issued in late January, 2007).) Prior to receiving this notice, Lande had the opportunity to meet with Department officials in the presence of an FOP officer. While Lande characterizes his November 2006 meeting with the Department administration as unpleasant, he confirms that he was asked — indeed, "interrogated" — about his role in the MDT incident and given a chance to explain his actions. (Lande Dep. 337-38.) This meeting thus constituted an opportunity to present reasons, in person, why he should not

be disciplined. *See Loudermill*, 470 U.S. at 546 (describing the "essential requirements of due process" as notice and an opportunity to respond).

The grievance proceedings mandated by the CBA further rendered the risk of erroneous determination "minimal." *See Solomon v. Phila. Hous. Auth.*, Civ. A. No. 02-6630, 2004 WL 1427140, at *4 (E.D. Pa. June 4, 2004) (noting that the "risk of an erroneous determination in grievance proceedings mandated by a collective bargaining agreement is minimal.") Although Lande alleges the FOP did not effectively prosecute his grievances, these allegations form the basis of a claim against the FOP — not a § 1983 action against the City Defendants. *See Wagner v. Pa/ Capitol Police Dep't*, Civ. A. No. 07-1310, 2009 WL 453281, at *7 (M.D. Pa. Feb. 23, 2009) (noting that plaintiff's failure to appeal police union's decision to hold grievance claim "in abeyance" was "more properly the subject of proceedings against the union" than against the police department). In this case, the evidence indicates that the FOP declined to press Lande's grievances beyond initial discussions with the Department administration. (Lande Dep. 299.) Though Lande argues that past-FOP president Marshall had a policy of pursuing every grievance, the approach of a former FOP official does not constitute evidence that the City violated Lande's procedural due process rights.

Further, Lande failed to exercise his right to appeal to the state FOP headquarters. (Opp'n to Union's Mot. for Summ. J. Ex. B., FOP Bylaws art. XVI.) Lande claims the FOP never told him that he had that right under the FOP's bylaws. (Lande Union Statement ¶¶ 24-36, 43.) Lande's purported ignorance of the grievance procedure is belied by his obvious familiarity with the FOP's grievance practices, as he successfully grieved discipline previously in his long career with the Department. *(See* Lande Dep. 192, 427-29.) The City cannot be held responsible for the FOP's failure to inform Lande of his right to appeal their decision internally.

22

Weighing the *Mathews* factors, the Court concludes that these procedures minimized the risk of an erroneous decision. Further, the record indicates that Lande's conduct in both instances — the MDT incident and his report to Obrecht — significantly disrupted Department operations. The MDT incident sparked a physical confrontation in the station house, while the tardiness of Lande's eleventh-hour report to Obrecht wasted the Department's and the local court's resources. Finally, Lande's six-day suspension — served over two pay periods — does not appear to have come close to depriving him "of the means of his livelihood." *See Gilbert*, 520 U.S. at 932.

Lande received all the process he was due. The Court will therefore dismiss his § 1983 procedural due process claim.

### ii. *Liberty interest*

Lande alleges the City Defendants deprived him of his "Fourteenth Amendment interest in his . . . liberty" by suspending him for six days without pay. (Am. Compl. ¶ 103.) It is not clear which liberty interest Lande intends to invoke. However, his allegations that he was subjected to a "hostile work environment" and that Lieutenant Strawn left a disciplinary letter in plain view in the Department which contained "untrue and offensive statements" suggest that Lande is seeking to recover for damage to his reputation. (*See* Am. Compl. ¶¶ 36, 43-45.) To recover under § 1983 for damage to reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest. *Dee*, 549 F.3d at 233-34.

Unpaid suspensions do not trigger procedural due process protection for such a liberty interest, even if a plaintiff has established a property interest in his employment. *Organtini v. Methacton Sch. Dist.*, Civ. A. No. 06-2213, 2008 WL 324022, at *7 (E.D. Pa. Feb. 6, 2008) (citing *Edwards v. Calif. Univ. of Pa.*, 156 F.3d 488, 492 (3d Cir. 1998)). The Court will therefore dismiss

Lande's liberty interest claim.

b.    *Substantive Due Process*

The Fourteenth Amendment protects individuals from deliberate, arbitrary abuses of executive power notwithstanding the absence of a procedural due process violation. *See Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000). The plaintiff must establish that he has been deprived of a constitutionally fundamental property interest to sustain such a claim. *Id*. at 140-42. Substantive due process claims also require a showing that the government deprivation of that interest shocks the conscience, regardless of the procedures used. *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008).

A "property interest in public employment is not a fundamental right protected by the guarantee of substantive due process." *Lynch v. Ramsey*, Civ. A. No. 10-3436, 2010 WL 4400027, at *5 n.2 (E.D. Pa. Nov. 2, 2010)(citing *Nicholas*, 227 F.3d 133, 141, 143). Lande's suspension thus does not give rise to a substantive due process claim under the Fourteenth Amendment. *See Lynch*, 2010 WL 4400027, at *5 n.2; *see also Wagner*, 2009 WL 453281, at *5 n.3 (noting that plaintiff-policeman's "position with the State Police did not constitute a property or liberty interest subject to the protection of substantive due process.")

c.    *Disparate Treatment*

Lande alleges that his association with Lopez and "other protected activity" led the City Defendants to subject him to disparate treatment. (Am. Compl. ¶ 101.) To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against him because of his membership in a protected class. *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009). Plaintiffs who do not assert

membership in a protected class must recover under a "class of one" theory. *Snyder v. Kraus*, Civ. A. No. 08-5217, 2010 WL 3419890, at *4 (E.D. Pa. Aug. 27, 2010) (citing Hill, 455 F.3d at 239)).

Lande's counsel stated at oral argument that Lande's disparate treatment claim is grounded on a "class-of-one" theory. The Supreme Court has observed that "the class-of-one theory of equal protection — which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review — is simply a poor fit in the public employment context." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 605 (2008). The Equal Protection Clause is thus not implicated where "government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner." *Id.*

The Court will therefore dismiss Lande's disparate treatment claim.

### D.    Section 1985 Claim Against All Defendants

Lande alleges violations of subsections (1), (2) and (3) of 42 U.S.C. § 1985 against the City Defendants and the FOP. (Am. Compl. ¶¶ 112-124.) The evidence supporting these claims is insufficient to permit them to proceed to a jury.

#### a.    Section 1985(1) claim

Under 42 U.S.C. § 1985(1), a plaintiff may recover upon a showing that two or more defendants conspired "to prevent, by force, intimidation or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof . . . ." Section 1985(1) claims thus require a showing that the plaintiff is a federal officer. *Robinson v. Canterbury Vill., Inc.*, 848 F.2d 424, 430 n.5 (3d Cir. 1988) (citing *Kush v. Rutledge*, 460 U.S. 719, 724-25 (1983)). The record indicates that Lande was not a federal officer

at the time of the incident. (*See* Lande Dep. 11-13.) The Court will thus grant summary judgment on Lande's claim under § 1985(1). *See Warner v. Montgomery Twp.*, Civ. A. No. 01-3309, 2002 WL 1623774, at *11 (E.D. Pa. July 22, 2002).

### b.    Section 1985(2) claim

The essential elements of a § 1985(2) claim of witness intimidation are:  (1) a conspiracy between two or more persons; (2) to deter a witness by force, intimidation or threat from attending court or testifying freely in any pending matter; which (3) results in injury to the plaintiff. *Glass v. City of Phila.*, 455 F. Supp. 2d 302, 364 (E.D. Pa. 2006) (citing *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341 356 (3d Cir. 1986)).  Lande offers no evidence that he was intimidated or threatened with respect to his testimony or potential testimony and thus he cannot sustain a § 1985(2) claim.

### c.    Section 1985(3) Claim

To sustain a claim under § 1985(3), plaintiffs must demonstrate both a conspiracy and a racial or class-based animus motivating the conspiracy which is designed to deprive a person or class of persons of equal protection under the law. *Bush v. Adams*, Civ. A. No. 07-4936, 2008 WL 314251, at *6 (E.D. Pa. Feb. 1, 2008).  This animus must imply "more than intent as volition or intent as awareness of consequences," but rather "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group. *Jackson-Gilmore*, 2005 WL 3110991, at *14 (E.D. Pa. Nov. 18, 2005) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272 (1993)).  Though the plaintiff need not prove that he is a member of the class entitled to statutory protection, he must establish that "invidiously discriminatory animus" lay behind the defendant's actions. *See Pagliacetti v. City of*

*Phila.*, Civ. A. No. 09-1106, 2010 WL 3222153, at *7 (E.D. Pa. Aug. 13, 2010); *Jackson-Gilmore*, 2005 WL 3110991, at *13-14.

Lande has produced no evidence demonstrating that he was suspended because of racial or class-based discriminatory animus. This failure to demonstrate any causal connection between any such discriminatory intent and his suspension is fatal to this claim.

### E.    Section 1986 Claim Against All Defendants

Lande alleges violations of 42 U.S.C. § 1986 by all defendants. Section 1986 provides "an additional safeguard" for victims of § 1985 violations, allowing a plaintiff to recover for a defendant's wrongful failure to thwart a § 1985 conspiracy. *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994). A claim under § 1986 is predicated on a preexisting violation of § 1985. As the Court has already determined that Lande cannot maintain a § 1985 claim, summary judgment is appropriate on his § 1986 claims as well. *See id.* at 1295 n.5.

### F.    Remaining State Law Claims

Lande has failed to present any viable federal cause of action; only his state law claims remain. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction when it has dismissed all claims over which it has original jurisdiction. Because Lande's claims have been dismissed before trial and considerations of judicial economy, convenience, and fairness to the parties do not dictate otherwise, the court declines to exercise supplemental jurisdiction over the remaining state law claims.

## IV.    CONCLUSION

The Court will enter summary judgment against Lande on his federal claims for the reasons

discussed above.  As only state law claims remain, the Court declines to exercise its supplemental

jurisdiction.  An Order consistent with this Memorandum will be docketed separately.